SANFORD L. MICHELMAN (SBN 179702)
Email: smichelman@mrllp.com
MONA Z. HANNA (SBN 131439)
Email: mhanna@mrllp.com
MARC R. JACOBS (SBN 185924)
Email: mjacobs@mrllp.com
TAYLOR C. FOSS (SBN 253486)
Email: tfoss@mrllp.com
**MICHELMAN & ROBINSON, LLP**
10880 Wilshire Blvd., 19th Floor
Los Angeles, CA 90024
Telephone:310-299-5500
Facsimile: 310-299-5600

Attorneys for Plaintiff, KURT LAUK

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| KURT LAUK, an individual,<br><br>Plaintiff,<br><br>v.<br><br>VISTA EQUITY PARTNERS, LLC, a Delaware Limited Liability Company; and DOES 1-50 inclusive<br><br>Defendants. | Case No.:<br><br>**COMPLAINT FOR:**<br><br>1. **INTENTIONAL INTERFERENCE WITH CONTRACT;**<br>2. **INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS; AND**<br>3. **NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS.**<br><br>**PUNITIVE DAMAGES DEMANDED**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Judge:<br>Dept.:<br>Action date: |

1

COMPLAINT

Plaintiff Dr. Kurt Lauk (hereinafter "Plaintiff" or "Dr. Lauk") hereby alleges, by the undersigned attorneys, upon personal information as to himself, and upon information and belief as to all other allegations, as follows:

## **THE PARTIES**

1.      Plaintiff Dr. Lauk served on the Board of Directors for Solera Holdings, Inc. (hereinafter "Solera Holdings") and Solera Global Holding Corp. (hereinafter "Solera Global"). Hereinafter, Solera Holding and Solera Global are collectively referred to as Solera, unless otherwise indicated.  At all relevant times, Dr. Lauk was and is a resident of Stuttgart, Germany.

2.      Solera is a global business that provides risk management and asset protection software and services to the automotive industry and property insurance marketplace.

3.      Defendant Vista Equity Partners (hereinafter, "Vista") is an investor in Solera.  Vista is headed by Chief Executive Officer, Robert Smith ("Smith"), Chief Operating Officer, David Breech ("Breech"), and President Brian Sheth ("Sheth").  Christian Sowul and Darko Dejanovic are board members of Solera Global, having been appointed by Vista.  On information and belief, Defendant Vista is a Delaware limited liability company, registered in the State of California as entity number 200014510018 and with its principal place of business at 4 Embarcadero Center, San Francisco, CA 94111.

4.      Plaintiff does not know the true names and capacities of the Defendants sued herein as Does 1 through 50, inclusive, and therefore sues such Defendants by such fictitious names.  Plaintiff will ask leave of the court to amend the complaint when the true names and capacities of such fictitious names of Defendants are ascertained. Plaintiff is informed and believes and thereon alleges that such fictitiously named Defendants are liable to Plaintiff for the facts and circumstances herein alleged.

5.      Plaintiff is informed and believes and thereupon alleges that Does 1 through 50 inclusive, are partners, co-conspirators, business partners, co-investors, and/or agents of each other, and aided and abetted each other in committing the acts complained of herein.

## JURISDICTION AND VENUE

6.      This Court has personal jurisdiction over Vista because Vista has extensive contacts with, and conducts business within, the State of California and in this Judicial District, including holding numerous meetings in Los Angeles, California.

7.      This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332. Specifically, the amount in controversy exceeds $75,000 and the civil action is between citizens of different states and in which a citizen of a foreign state is a party. *See* 28 U.S.C. § 1332(a)(2)&(3).

8.      Venue is proper in this Court because Vista's CEO Smith resides in this Judicial District and a substantial part of the acts and events giving rise to Plaintiff's claims occurred in this District.  Further, Defendant Vista and Smith regularly conduct business relating to Defendant and Solera in Los Angeles, California, from Smith's homes in Los Angeles, and at locations designated by Smith in Los Angeles.  Further, Defendant regularly held and continues to hold business meetings relating to Defendant in Los Angeles, because Smith resides in Los Angeles, and as such, Vista employees regularly meet to conduct Solera, Solera Holding, and Vista-related business in Los Angeles, Malibu and/or Santa Monica.

## CLAIMS COMMON TO ALL COUNTS

9.      Solera Holdings (then-called, "Summertime Holdings") was founded by Anthony Aquila ("Aquila") in January 2005.

///

COMPLAINT

10.     On December 14, 2016, Dr. Lauk entered into a Board Member Services Agreement with Solera Holdings.  Exhibit 1 hereto. In that agreement, Dr. Lauk agreed to serve as a member of the Board of Directors of Solera Holdings in exchange for compensation, including a director retainer fee and an annual director fee.  Solera Holdings and Dr. Lauk modified the Board Member Services Agreement on March 22, 2017 to increase the amount of Dr. Lauk's annual director fee. Exhibit 2 hereto.  Dr. Lauk was asked to serve as a Board Member because of his extensive business experience and stellar reputation. With an M.A. in History and Theology from the Ludwig Maximilian University of Munich, a Ph.D. in Political Science from the University of Kiel, and an MBA from Stanford Graduate School of Business, Dr. Lauk has served, amongst other examples, (a) as the Deputy Chief Executive Officer and Chief Financial Officer of Audi AG, (b) as a Member of the Board of Management and Head of World Wide Commercial Vehicles Division of Daimler Chrysler, (c) as a member of Solera Holdings' Audit Committee when Solera Holdings was publicly traded; and (d) as a Member of the European Parliament from 2004-2009, during which he was a Member of the Economic and Monetary Affairs Committee and a Deputy Member of the Foreign Affairs Committee.

11.     Further highlighting Dr. Lauk's ongoing prominent business expertise, Dr. Lauk currently (i) sits on the Board of Directors for  Magna International Inc. and is the Chairman of the Technology Committee of Magna, (ii) is a Trustee of the International Institute for Strategic Studies in London, (iii) is an honorary professor with a chair for international studies at the European Business School in Reichartshausen, Germany; (iv) is the co-founder and current President of Globe CP GmbH; and (v) is an adviser on the Economic Council to German chancellor, Angela Merkel.

///

///

12.     Based on Dr. Lauk's support to Solera's founder, Tony Aquila, Dr. Lauk used his industry relationships to introduce Solera (and Tony Aquila) to numerous industry CEOs and decision makers in Brussels.  As a consequence of Dr. Lauk's support, various industry companies became customers of Solera. These customers, based on Dr. Lauk's support, were an important reason for Solera's overall growth and success[1].

13.     On June 27, 2018, Solera and Dr. Lauk entered into a Stock Option Agreement granting Dr. Lauk stock options in connection with, and as a part of, the compensation and incentive arrangements between Solera and Dr. Lauk. Specifically, in that agreement, Solera granted Dr. Lauk the option to purchase up to 1,538 shares of Common Stock at an exercise price per share of $1,012.97 ("Service Options"). See Exhibit 3 hereto.

14.     The Stock Option Agreement stated that Dr. Lauk's Service Options would vest and become exercisable with respect to forty percent (40%) of the Service Option Shares on the Vesting Commencement Date—June 27, 2018—and an additional five percent (5%) of those Service Options would vest on the last day of each calendar quarter thereafter, so long as Dr. Lauk continued to be on the Solera Board.

15.     Solera Holdings was a publicly-traded corporation.  In September 2015, Solera Holdings announced that it would be acquired by a group led by Vista in a "take-private" acquisition.  On information and belief, Aquila took Solera Holdings private for the purpose of being able to grow Solera Holdings, based on organic growth, inorganic growth, and an I&A model, *i.e.* "invent and acquire" (hereinafter, the "Total Growth Model").  On information and belief, based on representations by Vista that they wanted to grow Solera Holdings and

---

[1]  Based on Vista's strangle-hold on Solera, Dr. Lauk is no longer able to, in good-faith, endorse Solera as long as Vista continues with its conduct.

pursue the Total Growth Model, Smith's company, Vista, was able to acquire a controlling interest in Solera Holdings.

16.   To finance the acquisition of Solera Holdings, eight funds affiliated with Vista became major stockholders of the resulting company ("Solera Global" or "Solera") by purchasing 1.089 million shares of Company common stock ("Common Shares") for $1.089 billion.

17.   Investors, including Vista purchased millions of shares.  While Vista initially promised to completely fund the equity portion of the deal with Common Share purchases, Vista failed to completely fund and fell short of funding by $1.4 billion because, despite its public relations campaign-spin, Vista, it turns out, did not actually have the equity available to close the transaction.  In fact, the closing of the transaction was delayed because Vista was still trying to secure debt to make up for the lack of money.

18.   Solera Holdings and Aquila did not know about Vista's lack of money and need to take on debt to close the transaction.

19.   As a result of Vista's shortfall, Solera Global sold 0.8 million shares of its Series A Preferred Stock ("A Preferred Shares") to affiliates of Koch, Goldman Sachs, and the Province of Quebec for $0.784 billion, and even worse, 0.4 million shares of its Series B Preferred Stock ("B Preferred Shares") to affiliates of Koch for $0.4 billion.

20.   Solera Holdings and Aquila never anticipated that Vista would be unable to close the transaction and would, as a result, need to issue B Preferred Shares.  The interest rate of the B Preferred Shares created a huge complication for Solera Global, specifically as to its cash flow and ability to pursue the contemplated Total Growth Model.

21.   On March 3, 2016, the take-private acquisition was completed, existing stockholders of Solera Holdings were bought out, and Solera Global became a private company.  In this "take-private" transaction, as described above,

Vista came to own 52% of Solera, and a controlling number of seats on Solera's Board of Directors (hereinafter, "Solera Board" or "Board").

22.    Solera, under the majority ownership of Vista, then hired Aquila as its CEO and Chairman of the Board.  On December 14, 2016, Dr. Lauk became a Board member.

### Vista's Self-Dealing

23.    Beginning on or around 2017, Vista, by and through its CEO, Smith and COO, Breech, undertook a course of action to interfere with the management of Solera and instead engaged in a pattern of self-dealing, misrepresentations, and improper conduct designed to benefit Vista at the expense of Solera, and its shareholders.  Vista completely disregarded corporate governance and treated Solera as if Vista is the only stockholder.

24.    As an example of Vista's improper conduct, Vista guided Solera away from profitable acquisitions, and instead toward self-dealing acquisitions, where the Solera Board members appointed by Vista (namely Smith, Sowul, Breech, and Dejanovic) had self-interested profit motives (and thus conflicts of interest).  When Board members objected to Vista's conduct, Vista engaged in retaliatory actions against them, by oppressively using their majority shareholder interests and/or control of the Board, to silence the objecting Board members, shutting them out of meetings and the like.

25.    Once such self-interested action by Vista occurred in 2017, when the Chairman of the Board, Aquila, had arranged a transaction for Solera to purchase a video telematics and fleet management company named Lytx, a global leader in video telematics owned by GCTR. Aquila secured a potential acquisition of Lytx for $1.1 billion (hereinafter, "Lytx Purchase").  This was a great opportunity for both GCTR *and* Solera, because of Lytx's growth potential and the synergy between the businesses of Lytx and Solera. The acquisition was, in fact, entirely consistent with Solera's Total Growth Model. Aquila, Dr. Lauk and other non-

Vista affiliated Board members knew, through their extensive diligence, that the Lytx Purchase would prove to be highly financially beneficial to Solera and its stockholders.

26.    Notwithstanding the benefit to Solera and Solera's stockholders, and even after Vista's CEO, Smith, had initially greenlighted the Lytx Purchase, in a stunning about-face, after realizing that the Lytx Purchase would not be good for his own company, Vista, Smith and Vista's representatives on the Board unexpectedly *blocked* the Lytx Purchase. In doing so, Vista's representatives on the Solera Board falsely asserted that Lytx was only worth $800 million. Vista's excuse for blocking the transactions was contrary to Solera's extensive diligence and without any comparable diligence of their own, all in order to justify a false narrative that the acquisition was "not a good deal" *for Solera*. Vista's representatives on the Solera Board knew or should have known that this valuation was incorrect, and nonetheless, they allowed Vista to interfere with said Board members' duties and obligations owed to the Solera stockholders.  In fact, later, outside investors came to value Lytx at $1.7 billion, confirming the intentional and negligent valuation of Lytx by Vista's representatives on the Solera Board.

27.    On information and belief, Vista and its Solera Board representatives made their assertions regarding the value of Lytx and blocked the Lytx Purchase in bad faith, for an improper and self-interested profit motive. Specifically, Vista and its Solera Board representatives, blocked the Lytx purchase because they wanted, instead, to force Solera to purchase one of Vista's *other* failing portfolio companies, Omnitracs, LLC ("Omnitracs").  Omnitracs is a competitor of Lytx, offering comparable services. Vista had bought Omnitracs in 2013 for approximately $800 million, and after being unable to successfully and/or profitably run the company, Vista has been trying to sell Omnitracs since at least June 2017.  Vista and Smith were hoping to pawn off Omnitracs on Solera by

using Solera's money to bail them out of an unsuccessful and poorly run acquisition, and bury it inside Solera's portfolio where Vista could hide its Omnitracs-investment-mistake from its own investors.

28.     The self-dealing and conflict of interest regarding the proposed Omnitracs acquisition is highlighted by the fact that both Christian Sowul and Darko Dejanovic served on the Solera Board and the board of directors of Omnitracs.

29.     Board members specifically told the Solera Board that Christian Sowul should not be on both the Solera and Omnitracs boards simultaneously as they were competitors with adverse interests.  Board members raised concerns about exposing Solera's strategic to individual(s) tasked with directing a competing company's decisions to compete with Solera.

30.     While at one point it was represented that Christian Sowul was being taken off the board of Omnitracs, months later it was revealed that Christian Sowul had not ended his role as a board member.

31.     Later it was discovered that Darko Dejanovic – another Solera board member appointed by Vista – likewise was concurrently serving on the board of directors of Omnitracs with a similar conflict of interest.

32.     It is for these reasons that Vista and its Solera Board representatives – all who had a direct and/or indirect financial stake and interest in Omnitracs and wanted Solera to buy Omnitracs for their own personal benefit – blocked the Lytx purchase and opted to pursue the Omnitracs purchase instead.  Essentially, Vista and its Solera Board representatives were attempting to use Solera's financial power as a "bail out" for their prior bad and underperforming Omnitracs investment.  The attempted Omnitracs purchase evidences an attempt by Vista and its Solera Board representatives to use Solera's financial power and wherewithal for their own financial motives (for the benefit of Vista, *et al*.), all at Solera's and Solera's shareholders' expense.

33.     Plaintiff is informed and believes, and based thereon alleges, that the real reason Vista acquired its controlling interests in Solera was not to help "grow" the company, but rather, because Vista was not doing well and/or had made poor investment decisions. As such, Vista needed to take control of a successful company like Solera so that it could use Solera's money to help bail Vista (and Smith) out of poor or underperforming investments like Omnitracs. Vista and Smith never had a "growth" plan for Solera as represented; rather, Vista and Smith had the opposite goal for Solera, namely, to use it to bleed millions of dollars their direction, and to re-direct Solera's money to or for the benefit of Vista, Smith and/or the other Vista-controlled Board members.

34.     Defendants have flaunted Solera's corporate governance, treating Solera like their personal piggy bank to pursue purchasing their own portfolio companies using Solera's money (because it benefitted them personally) rather than other available and more appropriate or profitable business opportunities. This action seeks relief on behalf of Dr. Lauk for the reprisals made against him by Defendants when Dr. Lauk and the other minority shareholders of Solera, attempted to reign in the majority shareholder running amok.

35.     Thus, and for all of the reasons set forth above, Vista and its Solera Board representatives sabotaged Solera's business objectives to acquire Lytx.  The missed opportunity in the Lytx deal cannot be understated.  Beyond the actual loss of hundreds of millions of dollars in value, the transformational aspect of the acquisition in the form of synergistic benefits to Solera and its other businesses would amount to hundreds of millions of additional dollars of value to Solera that were lost because of Vista's self-dealing.

36.     To accomplish the above, Vista and Smith represented to Vista's investors that Vista was not involved in Solera and did not operate or control Solera.  However, Vista's actions—including its meddling and self-dealing—establish otherwise.  Vista has been making false statements to its investors,

telling them it is "not involved" in Solera in an attempt to give their self-dealing the veneer of being an arms-length transaction when nothing could be further from the truth.  Vista is misleading its own fund investors.

37.    Vista's actions appear designed to mislead current and future investors concerning Vista's performance, and/or to cover up for Vista's poor performance, liquidity and/or bad investment decisions – like Omnitracs. For example, Smith commonly lures investors into Vista by representing that he (*i.e.*, Vista) has never lost in an investment. That, however, is not truthful as Vista has been involved in investments that have lost money. For instance, one of Vista's investments had an estimated EBITDA of fifty million dollars ($50,000,000.00), but ultimately was reduced to zero after Vista acquired it.  Despite this fact, Smith claims neither he nor Vista has ever lost money in an investment so as to lure additional unsuspecting investors into Vista.  Smith is hiding these losses and when those that know, speak up – like Dr. Lauk – Smith tries to discredit or terminate them.

## Smith and Vista Exceed Their Authority
## and Attack Dr. Lauk

38.    On information and belief, Vista, under the direction of Smith and Breech, oppressively used Vista's 52% ownership in Solera and/or their control of the Board to interfere with founder Aquila, dictating how he should conduct his job, giving directions and "directives" to Aquila with respect to Aquila's job responsibilities as CEO for Solera, cutting off Aquila's emails and access to Solera, all to the detriment of Solera, which had enjoyed and benefited from Aquila's leadership since 2005.  Ultimately, Vista oppressively used its majority ownership and/or control of the Board to terminate Dr. Lauk from Solera's Board without good cause for purposes of enabling Defendants to continue to abuse Solera.

///

39.     Smith and Vista turned on Dr. Lauk based on their own self-interests—not because of any fault of Dr. Lauk.   In fact, when other Board members asserted their own objections to Defendants' improper, unilateral, and self-interested actions, Defendants oppressively used their majority shareholder interest to force Dr. Lauk's termination.  Specifically, when Dr. Lauk requested an investigation by a "special committee" of the Board into Vista's alleged illegal conduct, Vista terminated him to block and otherwise prevent an investigation into Vista's alleged illegal conduct.  Defendants have orchestrated and/or caused the termination of individuals who raised objection with Defendants' actions, to silence them.  From the very beginning after the "take-private" transaction, Vista as the majority shareholder interfered with the "Total Growth Model" plan, and instead, implemented a cost cutting strategy to obtain *short term* profits for itself. Solera Holdings was the biggest acquisition Vista and Smith had ever made, and growing Solera was something neither Vista nor Smith knew how to do, and Dr. Lauk, with his extensive experience, was trying to do nothing more than help them.

40.     Board Members, such Dr. Lauk, disagreed with Defendants' cost cutting and bleed strategy for Solera. Dr. Lauk, as a Solera board member objected.  Specifically, on March 31, 2019, Dr. Lauk sent a letter to the Solera Board stating his objection to the way Vista has taken Solera in a direction opposite from Solera's vision. See Exhibit 4. Specifically, Dr. Lauk noted Vista's original promise during the take-private transaction:

> Dear Board of Directors:
>
> As you know, I have served as an independent member of the Board of Directors since 2013. It has been my privilege to help build Solera Holdings, Inc.  ("Solera") into an industry leader, and in fact, create a new industry altogether. My intention to see Solera succeed is a reason why I continue to remain a member of the Board. Unfortunately, in recent years, Solera has been taken into

a direction that is not consistent with its original vision. It is my hope that after reading this letter that the Board will reconsider the actions it is taking with respect to the direction of Solera.

\* \* \*

The foundation to this potential new partnership was Vista's commitment and representation to Solera, its Board, and entire executive team, to support Tony's ability to capitalize on the many attractive opportunities for growth and value creation.   In fact, Vista's pitch, so to speak, was that after the merger was completed, Vista would deleverage Solera's balance sheet, seek strategic acquisitions for the purchase of additional data, and expand Solera's global reach.

\* \* \*

In the beginning, it appeared that Vista was fulfilling its representations to support Tony's vision.   However, shortly thereafter, Vista's support ceased, and in fact, became antithetical to the very vision Solera was driving to achieve.   Specifically, after the close of the transaction, Vista did not deleverage Solera's balance sheet. Instead, it increased the leverage creating more pressure and burdens for the company. Worse yet, Vista's actions of not deleveraging the balance sheet has eroded current and future value of Solera. Additionally, when Tony sought to purchase Lytx, Vista ultimately rejected the proposal based on faulty and incorrect financial assumptions that damaged Solera. Instead, Vista attempted to have Solera purchase one of its other portfolio companies (i.e., Omnitracs), against the vote of the independent members of the Board. Purchasing Omnitracs would not have been in the best interests of Solera. Rather, its acquisition favored Vista in that it overvalued Omnitracs for the benefit of the Vista fund investors, all to the detriment of the Solera stakeholders. The Omnitracs acquisition idea was not only a direct conflict of interest but highlighted that Tony's vision for growth and value creation was being subordinated to the financial interests of Vista. The passing of Lytx in favor

of Omnitracs damaged Solera by approximately $1 billion in value creation. This is not the only situation in which Vista pressured Solera to acquire underperforming assets owned by Vista. Another example of this pressure is when Vista pushed Solera to acquire DealerSocket, a company which by most accounts has been struggling to succeed.

* * *

As an independent Board member, I am obligated to raise my objection to Vista's approach. Specifically, Tony's vision is to grow Solera and create additional value and that was the reason he was hired to serve as CEO and President. Vista has materially changed Solera's vision into one of reducing headcount, cutting costs, and shrinking aspects of Solera for the purpose of improving EBITDA in the short run. The reason Vista appears to be materially changing Solera's direction is because of Vista's failed strategy to purchase other Vista portfolio companies and lack of financial support for Solera's real growth.

* * *

I would welcome the opportunity to create a committee of the Board that is comprised of independent members to explore a strategic plan that does not deviate from the original vision, and reviews whether there are ways to reduce costs that are not going to impact a growth strategy.

See Exhibit 4.

41.   In response, Vista refused to create a committee of independent Board Members.  Thereafter, on May 26, 2019, Dr. Lauk wrote a letter to Vista's COO, Breech (Exhibit 5 hereto), stating:

It appears that Vista Equity Partners ("Vista") believes it can violate the corporate governance protocols of Solera Holdings, Inc. ("Solera") and its affiliates, among other

things. As you know, I have been objecting to Vista's inappropriate conduct and so too have other executives. In response, Vista has engaged in a pattern and practice of retaliatory actions against those that raise concerns. Vista's actions have included, but are not limited to, interfering with employees' contracts, modifying their job responsibilities, and pressuring them into making false and defamatory statements to support Vista's wrongful conduct. I must note that Vista has no position in Solera other than in its passive capacity as a shareholder. Yet, Vista is interfering in Solera's business by acting as if Solera employees are Vista employees, and worse yet, as if you are the CEO of Solera. Vista's conduct is simply unacceptable and must cease its inappropriate conduct.

As a member of Solera's Board of Directors, I am obligated to raise concerns about the exposure, and in turn, damages that Vista is causing. Despite Vista's unilateral proclamation that no special committee will be formed, as set forth in your letter, it is not Vista's decision. Rather, the decision to create a special committee to investigate Vista's actions is decided by the non-conflicted members of Solera's Board of Directors. At this stage, I would request that the non-conflicted Directors of Solera support my request to create an independent special committee to investigate Vista's actions (those non-conflicted Directors are copied on this message). The investigation should be conducted by an independent law firm selected by the special committee. If Vista takes actions to prevent an independent investigation that too will only be used later as evidence of Vista's wrongdoing.

Exhibit 5 hereto.

42.     In response, on the very same day, Vista forced Solera into terminating Dr. Lauk's Board position so as to silence another objector. In fact, Vista wrongfully removed Dr. Lauk from his position as a Board member, without

holding a proper or valid Board meeting to conduct the vote to remove Dr. Lauk. Furthermore, Solera's Termination Letter did not identify any cause for Dr. Lauk's termination.

43.     On August 9, 2019, Dr. Lauk sent a letter to Solera and Solera Holdings regarding the Stock Option Agreement dated June 27, 2018 between Solera Holdings and Dr. Lauk.  In that letter, Dr. Lauk provided notice that he was exercising all Vested Options under the Stock Option Agreement—and that he was exercising those options.  Specifically, Dr. Lauk was granted options to purchase 1,538 shares of Solera Holdings at an exercise price of $1,012.97.  See, Exhibit 6 hereto.

44.     Section (2)(e)(ii) of the Stock Option Agreement allows for the cashless exercise of stock options as follows:

> Optionholder may, in lieu of paying the Aggregate Exercise Price in cash, indicate in Optionholder's exercise notice that such Optionholder intends to effect a cashless exercise thereof and, in such case, the Company shall cancel such number of Option Shares otherwise issuable to the Optionholder having a Fair Market Value equal to the Aggregate Exercise Price of the Options being exercised, in which event the Company shall only issue Option Shares for the remainder of the Options being exercised after satisfying the Aggregate Exercise Price

45.     Based on the Stock Option Agreement, 80% of Dr. Lauk's options had vested.  Specifically, Dr. Lauk asserted that per the Stock Option Agreement: 40% of the options vested on the vesting commencement date of June 27, 2018; 5% vested on the last day of each calendar quarter thereafter (totally 20%) until his termination without cause on May 26, 2019; and an additional 20% vested pursuant to Section 2(c)(iv)(A) of the Stock Option Agreement based on his termination without cause.

46.     At the time of Dr. Lauk's letter, the fair market value of Solera Holdings stock underlying the vested options was $1,367.58 per share.

47.     On August 26, 2019, counsel for Solera and Solera Holdings sent a letter to counsel for Dr. Lauk stating that Dr. Lauk was incorrect about 20% of his options vesting on his Termination Date because there was no qualifying termination.  See Exhibit 7 hereto. Additionally, counsel for Solera and Solera Holdings asserted that all Contingent Options (if any) expired upon Mr. Lauk's removal from the Board of Directors.

48.     The August 26, 2019 letter from counsel for Solera and Solera Holdings did not state any basis as to why Dr. Lauk's termination was not a "qualifying" termination.  See Exhibit 7 hereto.

49.     Section 2(c)(iv)(A) of the Stock Option Agreement, entitled "Service Options" states:

> Notwithstanding anything herein to the contrary, in the event that Optionholder's employment with the Company or its Subsidiaries terminates due to Optionholder's termination without Cause, Optionholder's resignation for Good Reason or Optionholder's death or Disability (each such termination, a "Qualifying Termination"), the Service Options that would have vested during the twelve months immediately following the Termination Date had the Optionholder remained employed by the Company or its Subsidiaries during such period shall vest as of such Termination Date.

50.     The term "cause" for purposes of the Stock Option Agreement is defined as follows:

> "Cause" shall have the meaning ascribed to such term in any written offer letter or employment or severance agreement between the Company or any Subsidiary of the Company and such Participant, or in the absence of any such written agreement, shall mean (i) the commission of a felony or any other act or omission involving dishonesty, disloyalty or fraud with respect to the Company or any of its Subsidiaries or any of their customers or suppliers if the act or omission was wrongful or deliberate, or any other crime involving moral turpitude, (ii) conduct tending to bring the Company or any of its Subsidiaries into public disgrace or disrepute or economic harm,

(iii) repeated material failure or inability to perform duties and/or obligations as reasonably directed by the Board or its designees, after demand for performance has been given by the Board or its designees that identifies how such Participant has not performed its duties and/or obligations, (iv) gross negligence or misconduct with respect to the Company or any of its Subsidiaries, (v) any material breach of (A) any written agreement between the Company and such Participant evidencing the grant of any Option (B) the Company's written code of conduct and business ethics or (C) any other written agreement between such Participant and the Company or any Subsidiary of the Company.

51.    Dr. Lauk never resigned and is not deceased, such that the only qualifying termination at issue here is termination without cause.

## FIRST CAUSE OF ACTION

### Intentional Interference with Contractual Relations

### (Against Vista and DOES 1 - 50)

52.    Plaintiff re-alleges and incorporates by reference each of the numerical paragraphs both above and below as if fully set forth herein.

53.    Valid contracts existed between Solera and Dr. Lauk, namely in the form of (1) the Stock Option Agreement, dated June 27, 2018, and (2) the Board Member Services Agreement, dated December 14, 2016. Defendants were fully aware that Dr. Lauk had such contracts with Solera, and of the terms thereof.

54.    Defendants interfered with those contracts by engaging in the conduct alleged hereinabove, including but not limited to the following wrongful acts of interference by Defendants:  (a) conspiring and orchestrating false grounds to justify the termination of Dr. Lauk (b) refusing payment of the Service Options that vested based on Solera's termination of Dr. Lauk without cause.

55.    Defendants undertook the intentional acts as alleged herein above to disrupt the contractual relationships between Solera and Dr. Lauk.  Defendants intentionally interfered with Dr. Lauk's contracts with Solera, amongst other

reasons, in order to block Dr. Lauk's efforts to stop Defendants from misguiding and misusing Solera as a personal piggy bank to fund Defendants' self-interested acquisitions of Defendants' own portfolio companies and interests.  As Board members like Dr. Lauk, raised objections to Defendants' exploitation of Solera and cost-cutting model for Solera, Defendants retaliated by fabricating and actively orchestrating grounds to justify Solera's termination of Dr. Lauk, all to privately enrich themselves and/or to facilitate their self-interested strategy for Solera.

56.     Simply put, Defendants did all of this because they wanted Dr. Lauk out of the way so they could continue to bleed Solera and use Solera's funds to purchase Vista's portfolio companies at exorbitant, above market prices – rather than other available and better investment opportunities – all to the direct benefit of Smith, Vista and Vista's investors or shareholders, and to Solera's detriment. So that Defendants could continue to get away with their wrongful conduct, Defendants undertook actions to eliminate the objectors and opposition to their actions, like Aquila and Dr. Lauk, by interfering with their contracts, setting them up, and causing their termination from Solera.

57.     Defendants' wrongful actions have resulted in actual disruption of the contractual relationships alleged hereinabove, as Dr. Lauk has been terminated from Solera, allegedly for "cause" as written in Solera's May 26, 2019 termination letter drafted, written, directed and/or orchestrated by Defendants.

58.     By interfering with Dr. Lauk's contracts with Solera, Defendants blocked Dr. Lauk from the benefits thereof. Dr. Lauk has suffered and stands to suffer substantial harm resulting from the disruption of these contractual relationships, loss of the remuneration and other economics as set forth in the agreements, all in an amount in excess of the minimum jurisdiction of this court.

59.     Defendants' conduct was undertaken with malice, oppression and/or fraud, and was willfully, maliciously and oppressively committed with the

intention of causing Dr. Lauk to suffer extreme harm, warranting the imposition of punitive damages against Defendants for the reasons set forth herein. Dr. Lauk thus seeks punitive damages against Defendants for their willful and wanton and malicious behavior by interfering with Dr. Lauk's contracts with Solera.

## SECOND CAUSE OF ACTION

### Intentional Interference with Prospective Contractual Relations

### (Against Vista and DOES 1 -50)

60.     Plaintiff re-alleges and incorporates by reference each of the numerical paragraphs both above and below as if fully set forth herein.

61.     Valid contracts existed between Solera and Dr. Lauk, namely in the form of (1) the Stock Option Agreement, dated June 27, 2018, and (2) the Board Member Services Agreement, dated December 14, 2016. But for Defendants' aforementioned conduct, these contracts would have resulted in economic benefits to Plaintiff in the form of a director retainer fee and annual director fee, and stock options which increased in number and grew over time.

62.     Defendants were fully aware that Dr. Lauk had such contracts with Solera, and of the terms thereof.

63.     Defendants interfered with those contracts by engaging in the conduct alleged hereinabove, including but not limited to the following wrongful acts of interference by Defendants:  (a) conspiring and orchestrating false grounds to justify the termination of Dr. Lauk, depriving Dr. Lauk of future, ongoing director fees, (b) depriving Dr. Lauk of the Service Options that were to vest and the value of their grown over the period of time Defendants deprived Dr. Lauk from accruing by virtue of orchestrating false grounds for his termination.

64.     Defendants undertook the intentional acts as alleged herein above to disrupt the contractual relationships between Solera and Dr. Lauk, fully aware that disruption was certain or substantially certain to occur in both of Dr. Lauk's contractual relationships with Solera.  Defendants intentionally interfered with Dr.

Lauk's contracts with Solera, amongst other reasons, in order to block Dr. Lauk's efforts to stop Defendants from misguiding and misusing Solera as a personal piggy bank to fund Defendants' self-interested acquisitions of Defendants' own portfolio companies and interests.  As Board members like Dr. Lauk, raised objections to Defendants' exploitation of Solera and cost-cutting model for Solera, Defendants retaliated by fabricating and actively orchestrating grounds to justify Solera's termination of Dr. Lauk, all to privately enrich themselves and/or to facilitate their self-interested strategy for Solera.

65.   Simply put, Defendants did all of this because they wanted Dr. Lauk out of the way so they could continue to bleed Solera and use Solera's funds to purchase Vista's portfolio companies at exorbitant, above market prices – rather than other available and better investment opportunities – all to the direct benefit of Smith, Vista and Vista's investors or shareholders, and to Solera's detriment. So that Defendants could continue to get away with their wrongful conduct, Defendants undertook actions to eliminate the objectors and opposition to their actions, like Aquila and Dr. Lauk, by interfering with their contracts, setting them up, and causing their termination from Solera.

66.   Defendants' wrongful actions have resulted in actual disruption of the contractual relationships alleged hereinabove, as Dr. Lauk has been terminated from Solera, allegedly for "cause" as written in Solera's May 26, 2019 termination letter drafted, written, directed and/or orchestrated by Defendants.

67.   By interfering with Dr. Lauk's contracts with Solera, Defendants blocked Dr. Lauk from the prospective benefits thereof. Dr. Lauk has suffered and stands to suffer substantial harm resulting from the disruption of these contractual relationships, loss of the prospective remuneration, prospective director fees and other prospective economic benefits flowing from the loss of the prospectively accrued Options which Defendants deprived Dr. Lauk of as he was or would have ///

been entitled to as set forth in the agreements, all in an amount in excess of the minimum jurisdiction of this court.

68.    Defendants' conduct was undertaken with malice, oppression and/or fraud, and was willfully, maliciously and oppressively committed with the intention of causing Dr. Lauk to suffer extreme harm, warranting the imposition of punitive damages against Defendants for the reasons set forth herein. Dr. Lauk thus seeks punitive damages against Defendants for their willful and wanton and malicious behavior by interfering with Dr. Lauk's contracts with Solera.

## THIRD CAUSE OF ACTION

### Negligent Interference with Prospective Contractual Relations

### (Against Vista and DOES 1 -50)

69.    Plaintiff re-alleges and incorporates by reference each of the numerical paragraphs both above and below as if fully set forth herein.

70.    Valid contracts existed between Solera and Dr. Lauk, namely in the form of (1) the Stock Option Agreement, dated June 27, 2018, and (2) the Board Member Services Agreement, dated December 14, 2016. But for Defendants' aforementioned conduct, these contracts would have resulted in economic benefits to Plaintiff in the form of a director retainer fee and annual director fee, and stock options which increased in number and grew over time.

71.    Defendants knew and/or should have known that Dr. Lauk had such contracts with Solera, and of the terms thereof, because Vista was Solera's majority shareholder and controlled Solera's board of directors, which knew about and entered into the contracts with Dr. Lauk.

72.    Defendants interfered with those contracts by engaging in the conduct alleged hereinabove, including but not limited to the following wrongful acts of interference by Defendants:  (a) conspiring and orchestrating false grounds to justify the termination of Dr. Lauk, depriving Dr. Lauk of future, ongoing director fees, (b) depriving Dr. Lauk of the Service Options that were to vest and

the value of their grown over the period of time Defendants deprived Dr. Lauk from accruing by virtue of orchestrating false grounds for his termination.

73.     Defendants knew or should have known that disruption of Dr. Lauk's contractual relationships, and the resulting prospective economic benefits thereunder due Dr. Lauk, was certain or substantially certain to occur based on their conduct as alleged herein above.  Defendants interfered with Dr. Lauk's contracts with Solera, amongst other reasons, in order to block Dr. Lauk's efforts to stop Defendants from misguiding and misusing Solera as a personal piggy bank to fund Defendants' self-interested acquisitions of Defendants' own portfolio companies and interests.  As Board members like Dr. Lauk, raised objections to Defendants' exploitation of Solera and cost-cutting model for Solera, Defendants retaliated by fabricating and actively orchestrating grounds to justify Solera's termination of Dr. Lauk, all to privately enrich themselves and/or to facilitate their self-interested strategy for Solera.

74.     Simply put, Defendants did all of this because they wanted Dr. Lauk out of the way so they could continue to bleed Solera and use Solera's funds to purchase Vista's portfolio companies at exorbitant, above market prices – rather than other available and better investment opportunities – all to the direct benefit of Smith, Vista and Vista's investors or shareholders, and to Solera's detriment. So that Defendants could continue to get away with their wrongful conduct, Defendants undertook actions to eliminate the objectors and opposition to their actions, like Aquila and Dr. Lauk, by interfering with their contracts, setting them up, and causing their termination from Solera.

75.     Defendants' wrongful actions have resulted in actual disruption of the contractual relationships alleged hereinabove, as Dr. Lauk has been terminated from Solera, allegedly for "cause" as written in Solera's May 26, 2019 termination letter drafted, written, directed and/or orchestrated by Defendants.

///

76.    By interfering with Dr. Lauk's contracts with Solera, Defendants blocked Dr. Lauk from the prospective benefits thereof. Dr. Lauk has suffered and stands to suffer substantial harm resulting from the disruption of these contractual relationships, loss of the prospective remuneration, prospective director fees and other prospective economic benefits flowing from the loss of the prospectively accrued Options which Defendants deprived Dr. Lauk of as he was or would have been entitled to as set forth in the agreements.

77.    Defendants' conduct as alleged herein above, was a substantial factor in causing Plaintiff's harm and the loss of prospective economic benefits under the contracts.

78.    Plaintiff has been damaged in amount in excess of this Court's minimum jurisdiction, to be proven at the time of trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for Judgment against Defendants as follows:

1.    Compensatory damages in excess of the jurisdictional minimum of this Court;

2.    Punitive damages;

3.    Interest at the legal rate per annum;

4.    All costs of suit; and

5.    Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all causes of actions.

///
///
///

COMPLAINT

1

## **DEMAND FOR PUNITIVE DAMAGES**

2

Plaintiff hereby demands punitive damages against Defendants on his

3

claims as alleged hereinabove.

4

5

**MICHELMAN & ROBINSON, LLP**

6

7

8

Dated: September 11, 2019        By: _____

9

Sanford L. Michelman

10

Mona Z. Hanna

Marc R. Jacobs

11

Taylor C. Foss

12

Attorneys for Plaintiff Dr. Kurt Lauk

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28